**BEFORE THE UNITED STATES CIVILIAN BOARD OF CONTRACT APPEALS**
**Washington, D.C.**

| | |
|---|---|
| **CH2M HILL Hanford Group, Inc.**<br>*Appellant,*<br>*v.*<br>**United States Department of Energy,**<br>*Respondent.* | **CBCA No. 708**<br>**(Judge McCann)** |

## COMPLAINT

COMES NOW CH2M HILL Hanford Group, Inc. ("CH2M HILL"), by counsel, and for its Complaint, states as follows:

### Nature of the Case

1. This Complaint arises from the Respondent's ordered changes and constructive changes to a cost reimbursement incentive contract between CH2M HILL and the United States Department of Energy ("DOE"). Under this contract, CH2M HILL does not receive any fee unless it achieves certain performance measures. And if DOE does not provide CH2M HILL with funds to perform fee bearing work, CH2M HILL never can earn any fee. Accordingly, a basic premise of the Contract was that DOE would provide CH2M HILL with funds to perform fee bearing work. Here, as a result of DOE's ordered and constructive changes, CH2M HILL was required to divert funding from fee-bearing work to non-fee-bearing work, thus losing the opportunity to earn fee under the Contract. Specifically, DOE required CH2M HILL to resolve so-called "legacy vapor issues," work that was not part of the Contract Performance Baseline. CH2M HILL does not dispute DOE's authority to require, under the Changes clause, that CH2M HILL perform additional in-scope work, including resolving legacy vapor issues. However, in

this incentive type contract, changes to the Contract Performance Baseline directly impact the contractor's ability to earn fee. The Contract required DOE to cooperate with CH2M HILL in processing Baseline Change Requests ("BCRs"), mitigate the effects of the changes and equitably adjust the Contract to account for DOE's changes. Contrary to the Contract's requirements, DOE declined to act in a timely manner on CH2M HILL's requests for BCRs or to equitably adjust the Contract. DOE's failure to act resulted in CH2M HILL being required to perform additional work for no fee and precluded CH2M HILL from performing fee-bearing work.

2. Alternatively, DOE and CH2M HILL both were mutually mistaken as to a material fact at the time the Contract was formed. Specifically, both parties believed that the Contract could be performed without CH2M HILL having to make extensive use of supplied air for persons working on the Contract. CH2M HILL did not assume the risk that the Contract could not be performed without extensive use of supplied air. The need for the full-time use of supplied air only became apparent after certain vapors in certain concentrations were discovered, after contract formation, at the contract site. For this reason, even if there had not been changes to the Contract, the Contract should be reformed to reflect the additional fee that the parties would have provided for payment to CH2M HILL had they known at the time of contract formation that CH2M HILL would require the full time use of supplied air to perform the Contract.

3. On October 12, 2006, CH2M HILL filed a properly certified claim under the Contract Disputes Act, 41 U.S.C. §§ 601-613, for recovery of the lost fee opportunity arising from these ordered and constructive changes and, in the alternative, for

reformation of the Contract. CH2M HILL amended and recertified its claim on December 20, 2006.

4. CH2M HILL has been reimbursed for its costs of performing the additional work. At issue in CH2M HILL's claim, and at issue in this appeal, is DOE's denial of CH2M HILL's opportunity to earn a reasonable fee as required by the Contract, the Federal Acquisition Regulation ("FAR"), and the Department of Energy Acquisition Regulation ("DEAR").

5. On February 7, 2007, DOE issued a final decision denying CH2M HILL's claim in its entirety.

6. CH2M HILL filed a timely notice of appeal on April 16, 2007.

**Jurisdiction**

7. The Civilian Board of Contract Appeals has jurisdiction pursuant to the Contract Disputes Act, 41 U.S.C. § 607, as amended by the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 847, 119 Stat. 3394, 3395 (2006).

**Background**

8. CH2M HILL is a prime contractor to DOE, acting through the Office of River Protection ("ORP"), under Contract No. DE-AC27-99RL14047 (the "Contract"). CH2M HILL conducts the majority of its contractual activities on federally-owned land in southeastern Washington State on what is commonly referred to as the Hanford Site.

9. The original mission of the Hanford Site related to the production of weapons grade nuclear material. The production of weapons materials generated both

solid and liquid radioactive waste which was stored in 177 large (50,000 to 1,000,000 gallon) capacity underground single- and double-shell (wall) tanks. The single-shell tanks have exceeded their planned useful life. The waste within both the single- and double-shell tanks must be retrieved, treated, and disposed of in a permanent waste repository.

10. The materials in the tanks have the potential to generate vapors that are not radiological but contain ammonia and various volatile organic compounds. These vapors can escape the tanks through normal venting and other leak paths. The venting of vapors can cause strong odors and in sufficient concentration could be harmful to human health. As noted below, this concern led to the full-time use of supplied air in 1992; however, after extensive study, it was determined that supplied air was not required to protect workers. The decision that full time use of supplied air was not required for worker safety was made in 1996 and was borne out in the three years that followed and immediately preceded the formation of the Contract.

11. CH2M HILL is one of a succession of contractors that, under contracts with DOE, have had certain responsibilities for managing the Hanford Site Tank Farm. Westinghouse Hanford Company ("Westinghouse" or "WHC") was the Tank Farm Contractor from 1986 until September 1996. In 1996, Fluor Hanford, Inc. assumed management of the Project Hanford Management Contract, with its subcontractor, Lockheed Martin Hanford Corporation ("LMHC"), having responsibility for the Tank Farms.

12. LMHC became the Tank Farm prime contractor after DOE formed the ORP in 1998. Specifically, LMHC and DOE entered into Contract No. DE-AC06-99RL14047 on September 30, 1999.

13. CH2M HILL purchased LMHC in December 1999. Modification M006 to Contract No. DE-AC06-99RL14047, dated December 29, 1999, recognized LMHC's name change to CH2M HILL Hanford Group, Inc. Modification M006 stated that "all rights and obligations of the Government and the Contractor under this contract are unaffected by this change."

14. Modification M026 changed the contract number from DE-AC06-99RL14047 to DE-AC27-99RL14047. This numbering change made no substantive change to the Contract.

15. On January 17, 2001, the ORP extended CH2M HILL's Contract through September 30, 2006. Subsequently, DOE extended the Contract period of performance through September 30, 2008.

**Vapor Issues Predating the Contract**

16. Upon information and belief, between 1987 and 1992, during Westinghouse's tenure as the Tank Farm Contractor, there were several reports of workers falling ill due to vapors at the Tank Farm.

17. In early 1992, DOE initiated a Type B Investigation of Hanford Tank Farm Vapor Exposures. The designation "Type B" is a formal investigation that occurs pursuant to DOE Order 225.1A.

18. Also in early 1992, Westinghouse issued a series of directives that required workers in several specified tank farms to use supplied air for all work. The term "supplied air" refers to equipment such as self contained breathing apparatus ("SCBA") or portable supplied air systems.

19. In January 1993, Westinghouse initiated "personal sampling" of air in the tank farms. Personal sampling consists of attaching a device to a worker which samples the air in the breathing zone during the performance of the work task. Upon information and belief, Westinghouse collected over 350 personal samples from 18 tank farms during a variety of work activity.

20. On or about July 10, 1996, Westinghouse issued a report entitled "Tank Waste Remediation System Resolution of Potentially Hazardous Vapor Issues" (Doc. No. WHC-SD-TWR-RPT-001, Rev.0). That report is commonly referred to as the "Hewitt Report" after its author, Elton R. Hewitt, a Westinghouse engineer.

21. According to the Hewitt Report (page 6), the personal sampling described above showed maximum personal exposure levels for the contaminants of concern at one-tenth of the allowable 8-hour exposure levels and 30% of Short Term Exposure Limits ("STEL").

22. Also according to the Hewitt Report (page 10), the personal sampling and other monitoring led to the use of supplied air being significantly reduced by January 1994.

23. The Hewitt Report (page 11) further stated that supplied air was required in 41 tanks in the tank farms in March 1992, and in only two tanks in May 1996. The Report continued:

> These reductions have been methodical and scientifically based using standard Industrial Hygiene practices. They ensure worker safety and health, reduce risk to workers from physical strain of wearing supplied air respiratory protection, and allow for increased productivity.

24. The Hewitt Report (page 13) concluded that many of the reported vapor exposure incidents during 1987-1993 were not the result of actual exposure to hazardous vapor levels, but rather were the result of worker anxiety over the potential, but unknown, risks of vapors. Following better orientation and education of workers by Westinghouse, there was only one reported vapor exposure incident in all of 1995. The Report stated (on page 14), "Although the same levels of vapors are probably being released from the tanks as previously, unprotected employees are not being exposed to those levels."

25. The Executive Summary of the Hewitt Report summarizes its findings in relevant part, as follows:

> After four years, sufficient information has been collected to evaluate the effectiveness of the strategy and the resulting control measures. The conclusion is that the issues associated with protecting employees from overexposure to vapors during tank farm work are defined and controlled.
>
> Employee exposure incidents have virtually ceased due to the implementation of controls around potential vapor release points and as a result of better communications regarding vapor odors and risks. Additional studies are not needed to verify these conclusions . . . .

> It is concluded that tank farm worker health and safety considerations caused by the inhalation of potentially hazardous vapors have been resolved.

26. Upon information and belief, throughout Westinghouse's resolution of the hazardous vapor issues, the strategies, methods, results, conclusions and recommendations were reviewed and approved by a number of independent bodies. These included: the Occupational Safety and Health Waste Tank Advisory Panel, which consisted of nationally-recognized experts in the field of industrial health and safety; the Tank Farm Operations Advisory Council, which included Westinghouse and labor union representatives; and the Tank Farm Tank Vapor Task Team, which included representatives of several DOE contractors and DOE itself.

27. At all relevant times, DOE was aware of and approved (or did not disapprove) Westinghouse's strategies, methods, results, conclusions and recommendations described in the preceding paragraphs. DOE also approved the Tank Farm Health and Safety Plan (HASP) for work at the Tank Farm. The HASP did not require or contemplate extensive use of supplied air at the site of the contract work.

28. The Hewitt Report stated that "The intended users of this report include Tank Farm Workers, WHC Management, the Department of Energy, and the Public." And, DOE placed the report in ORP's Reading Room as a reference for, among others, future contractors. CH2M HILL did rely on the Hewitt Report in entering into the Contract.

29. Following the issuance of the Hewitt Report in 1996 and continuing for the next seven years, supplied air was used by tank farm workers only in limited situations

and was not required during the majority of routine tank farm tasks. During that time, CH2M HILL and DOE entered into the Contract.

**The Contract Provisions**

30. The Contract is a cost-reimbursement incentive contract and includes a fee pool.

31. The Contract allocates 100% of the available fee to performance measures, originally called "performance incentives" and now called "Performance Based Incentives" or "PBIs." This means that, unlike in a traditional cost-type contract which includes a "Base Fee" that is paid to the contractor automatically, CH2M HILL earns fee under the Contract only for performing specified fee-bearing work.

32. PBIs involve the completion of objectively measurable work that includes milestones contained in Hanford Federal Facility Agreement and Consent Order (HFFACO), i.e., milestones that DOE has agreed to with the U.S. Environmental Protection Agency and/or the State of Washington.

33. The Contract also provides an incentive called "Acceleration Fee" (formerly known as "Superstretch"). Under the Contract, CH2M HILL could earn Acceleration Fee by performing certain work that would be funded exclusively by cost savings generated by CH2M HILL in other areas of the scope of work. The determination of the acceleration scope and the Acceleration Fee value associated with each PBI is based on the estimated cost associated with the Contract Performance Baseline.

34. The Contract required CH2M HILL to create and maintain a planning and management tool called an "integrated life-cycle baseline." Contract § C.2.A(2)

(renumbered C.2(a)(2) by Modification A066) stated, among other things, that: "The baseline shall be the basis for budget development, input to risk analysis, and prioritization of work."

35. Contract § C.2.A(3) required CH2M HILL to--

> Translate specific fiscal year guidance from the Contracting Officer into direction for updating project baselines. ORP must approve the baselines and the supporting documentation before the Contracting Officer authorizes the commencement of work.

This requirement was completely reworded, but substantively unchanged, via Modification A066, which stated in § C.2.(a)(2)(viii):

> Any changes to the Contractor[']s current baseline shall be documented via a Baseline Change Request. . . . By December 15 of each year, the Contractor shall provide to DOE-ORP the appropriate allocation of funds for the next fiscal year by PBS and by line item.

"PBS" is an acronym of Project Baseline Summary.

36. The Contract contained a number of requirements relating to worker safety. These included:

> Work must be accomplished in a manner that achieves high levels of quality, protects the environment, the safety and health of workers and the public. . . . [Contract § C.1]

> The Contractor shall seek ways to streamline work processes by the use of necessary and sufficient standards and requirements. [*Id.*]

> Take necessary actions to minimize serious injuries/illnesses and / or fatalities and prevent radiological or chemical exposures to workers and environmental releases in excess of established limits. [*Id.* § C.2.D(1), later deleted from the Contract]