> Establish a structured, standards-based approach to planning and control of the work including identification, management and implementation of ESH&Q standards and requirements that are appropriate for the work to be performed and for controlling related hazards. [*Id.* § C.2.D(2) (second set of numbers), renumbered by Modification A066 to § C.2(d)(1)(ii)]

37. Modification A066, dated November 20, 2002, substantially rewrote the Contract's Statement of Work, including adding a section C.3 called "River Protection Project."

38. New § C.3(a) stated in relevant part:

> The River Protection Project (RPP) scope of this Contract encompasses activities identified in the Tank Farm Contract River Protection Project Baseline (hereafter "Tank Farm Contract River Protection Project Baseline" or "Baseline") as amended by approved Baseline Change Requests (BCRs) needed to: (1) safely store, operate and interim stabilize tank waste . . . .

39. Under the heading "Safe Tank Waste Storage," new § C.3(a)(1)(I) stated in part that CH2M HILL was responsible for "resolving outstanding safety issues and unreviewed safety questions to ensure safe storage and retrieval of waste."

40. At the time of Modification A066, i.e., November 20, 2002, neither DOE nor CH2M HILL considered tank vapors to be an "outstanding safety issue" because at least six years earlier tank vapors had been thoroughly reviewed and resolved by the Hewitt Report and other studies and investigations.

41. The Contract included or incorporated by reference the following standard FAR and DEAR clauses, among others:

- FAR § 52.216-1- -- Incentive Fee;
- FAR § 52.233-1 -- Disputes (Dec 1998), Alternate I (Dec 1991);

- FAR § 52.243-2 -- Changes - Cost Reimbursement, Alternate II;
- DEAR § 970.5215-1 -- Total Available Fee: Base Fee Amount and Performance Fee Amount;

42. FAR § 52.243-2 – Changes, states in part:

> (b) If any such change causes an increase or decrease in the estimated cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, or otherwise affects any other terms and conditions of this contract, the Contracting Officer shall make an equitable adjustment in the --
>
> (1) Estimated cost, delivery or completion schedule, or both;
> (2) Amount of any fixed fee; and
> (3) Other affected terms and shall modify the contract accordingly.

43. Section J of the Contract listed DOE Directives "applicable to work and activities conducted/accomplished by contractors at the Hanford Site," including DOE O 440.1A, entitled "Worker Protection Management for DOE and Contractors."

44. DOE O 440.1A, Attachment 2, § 10.d lists "personal protective equipment" as the least preferred method of hazard control.

**Renewed Vapors Issue**

45. In early 2003, subsequent to Contract Modification A066, tank farm workers again began reporting incidents of exposure to vapors.

46. By letter to ORP dated February 6, 2003, the Washington State Department of Ecology ("Ecology") initiated an inquiry into tank farm vapors.

47. On or about March 17, 2003, DOE's ORP Manager, Roy Schepens, responded to Ecology's February 6th letter, stating in part:

> Vapors from tank wastes are a known phenomenon that DOE has dealt with for over a decade, continually improving its understanding of potential release mechanisms and hazards, and using that understanding to better protect its workers (the existence of such vapors is well documented in DOE tank farm related permit applications and in permits issued to DOE by Ecology). [ORP letter, R. J. Schepens to Washington State Department of Ecology, 03-ED-304 dated March 17, 2003, entitled "Tank Farms Vapor Exposure Issues."]

48. DOE's Mr. Schepens wrote in the same letter:

> We offer workers protective equipment beyond what is required under DOE Orders or worker safety regulations[.]

49. He also wrote:

> Specific actions taken recently to enhance worker awareness and protection from tank vapors include the following: . . .
>
> - Commissioned independent industrial hygiene data, monitoring, and toxicological reviews, most recently with Prezant and Associates and Environmental Medicine, Inc. both of whom have validated internal findings that our programs are effective; . . .
>
> - Emphasized each worker's opportunity for voluntary respirator use;
>
> - Provided nuisance dust/odor masks to control odors below regulatory thresholds and increase worker comfort[.]

50. The reference in the first bullet above to DOE's "internal findings" was a reference to the Hewitt Report and subsequent studies that confirmed the findings and recommendations of the Hewitt Report.

51. The reference in the first bullet above to "our programs" which DOE considered to be "effective" did not involve mandatory, full-time use of supplied air for routine tank farm activities.

52. Mr. Schepens also wrote in the March 17th letter:

> The fact that vapors are being released is not an unresolved safety concern. It is a recognized phenomenon inherent in the design and operation of the tanks.

53. Mr. Schepens also wrote that "fugitive vapors emission are now and will be controlled within environmental regulatory limits." Finally, Mr. Schepens wrote:

> Monitoring during operations has verified environmental regulatory limits are not being exceeded.

54. Throughout the remainder of 2003 and into early 2004, workers continued to complain about vapors.

55. During the same period, DOE continued to take the position that existing precautions were adequate.

56. An investigation by DOE's Office of Independent Oversight and Performance Assurance (official acronym "OA") completed in April 2004 concluded that there had been no known cases of workers being exposed to chemical vapors at the Hanford Site Tank Farm in excess of regulatory limits, and available sampling data indicated that worker exposures were low.

57. This investigation questioned, however, a practice adopted during the early 1990's of presuming potentially hazardous vapors were only present in the work environment when the odor of ammonia could be detected. As subsequently confirmed by CH2M HILL, other potentially hazardous vapors -- including nitrous oxide -- could be present without the presence of ammonia, and the presence of nitrous oxide could not be detected by a worker's sense of smell. Further, air purifying respirators do not protect against nitrous oxide and other specific vapors.

**DOE's Direction**

58. On March 26, 2004, ORP Manager, Mr. Schepens, issued a letter to CH2M HILL entitled, "DIRECTION ON TANK FARM WORK." In that letter, Mr. Schepens, who is a Contracting Officer, wrote:

> Before performing work in the tank farms without respiratory protection, I am directing that CH2M HILL:
>
> - Re-evaluate the technical basis for monitoring organic and non-organic tank vapors;
> - Re-evaluate the adequacy of the monitoring equipment and the procedures directing its use;
> - Re-evaluate engineered features that have the potential to reduce or eliminate exposures;
> - Re-evaluate the adequacy of tank farm worker personal monitoring for tank vapors;
> - Increase its industrial hygiene monitoring of work activities; and
> - Evaluate expanded use of personal protective equipment.
>
> Before performing work in the tank farms without respiratory protection, please review the results of these actions with me.

59. The plain language of Mr. Schepens' direction admits that CH2M HILL was being directed to re-evaluate matters that had been evaluated previously.

60. In short, DOE directed CH2M HILL to perform a comprehensive re-evaluation of the vapors Health & Safety program. This required that CH2M HILL identify or characterize all vapors in the tanks and in some instances establish occupational exposure limits for the "found" chemicals. CH2M HILL then had to

determine what changes to existing procedures, if any, were required to best protect workers in light of this comprehensive re-evaluation.

61. The direction to perform a comprehensive re-evaluation of the Health & Safety program as that program related to worker vapor exposure was not part of the Contract Statement of Work or the Contract performance baseline when CH2M HILL was awarded the Contract. Rather, that direction constituted a change that materially diverted funds from fee-bearing activities.

62. Further, the requirement to maintain workers on respiratory protection until the conclusion of the comprehensive Health & Safety program re-evaluation was not part of the Contract Statement of Work or the Contract performance baseline when CH2M HILL was awarded the Contract. This requirement also resulted in a significant diversion of funds from fee-bearing activities.

63. DOE did not provide CH2M HILL additional funding to pay for the re-evaluation and other direction in DOE's March 26, 2004 letter. DOE did not provide CH2M HILL additional time to meet the fee bearing milestones in the Contract.

64. The practical effect of DOE's direction was to require CH2M HILL to provide all tank farm workers with supplied air indefinitely.

65. Working with respiratory protection, especially supplied air, is much less efficient than working without such equipment. DOE's own studies, including a June 2005 OA Report entitled "Independent Oversight Follow-Up Review of Worker Vapor Exposures and Occupational Medicine Program at the Hanford Site," have found that SCBA air tanks are heavy and awkward to wear, and they reduce worker's field of vision

and ability to communicate. These factors can lead to other (non-vapor) types of health hazards, such as heat stress, falls, and muscle strains, and may contribute to injuries. SCBAs reduce worker efficiency, and some workers complain about the inconvenience and discomfort (e.g., heat and dry air).

66. Evaluation by CH2M HILL indicates that using supplied air decreases productivity by 42 percent over the nine-hour workday that is standard at the Hanford Site.

67. A 1994 study by the U.S. Army Corps of Engineers found productivity loss of 48 to 61% from using supplied air.

68. Following the June 2005 OA report referred to above, CH2M HILL gave DOE written notice, citing the Changes clause, of CH2M HILL's "request for an equitable adjustment due to impacts resulting from changes in requirements for the protection of workers from chemical vapors." That notice explained:

> These changed conditions and changed requirements have significantly impacted CH2M HILL's ability to complete the work contained within the PBIs (including specifically tank retrieval and waste feed delivery projects) and thereby have and will significantly impact CH2M HILL's ability to meet Hanford Federal Facility Agreement and Consent Order (HFFACO) milestones and our ability to earn fee. Finally, these new and different requirements when applied to preexisting conditions have added significant new scope to our contract for which [DOE] has not provided additional new funding, thereby substantially impacting any meaningful opportunity for us to earn acceleration fee.

69. As explained above, CH2M HILL can earn fee under the Contract only by meeting milestones that have been made the subject of PBIs and/or by generating cost savings that fund Acceleration Fee work. As a result of DOE's direction, the new

requirement to perform additional studies, the new requirement to pay for breathing apparatus, and the new requirement to perform work in a significantly less efficient manner than previously required by the Contract, CH2M HILL was prevented from meeting some PBI milestones and also prevented from generating cost savings to fund Acceleration Fee work.

70. DOE also failed to cooperate in CH2M HILL's Baseline Change Request that would have mitigated some of the effects of the added requirements. For example, DOE refused CH2M HILL's requests to reschedule certain non-fee bearing work. Had DOE agreed to such requests, CH2M HILL could have used funds to meet fee bearing milestones.

71. DOE did not grant CH2M HILL an equitable adjustment to compensate it for the loss of fee as a result of DOE's actions and inactions. DOE did not equitably adjust the Contract to provide additional funding and time for CH2M HILL to meet the fee bearing milestones.

72. As stated above, on October 12, 2006, CH2M HILL filed a properly certified claim under the Contract Disputes Act, 41 U.S.C. §§ 601-613, for recovery of the lost fee opportunity arising from these ordered and constructive changes and, in the alternative, for reformation of the contract. CH2M HILL amended and recertified its claim on December 20, 2006.

73. On February 7, 2007, DOE issued a final decision denying CH2M HILL's claim in its entirety. DOE asserted in its final decision that re-evaluating the adequacy of tank farm worker personal monitoring for tank vapors, among other matters, and

providing supplied air was part of CH2M HILL's safety responsibility under the Contract and that there has therefore been no change. DOE's position in its final decision is contrary to positions DOE has taken in the past vis-à-vis both CH2M HILL and the State of Washington Department of Ecology regarding whether supplied air was required to ensure a safe working environment.

**COUNT I**
**(Equitable Adjustment for Ordered and Constructive Changes)**

74. CH2M HILL incorporates by reference paragraphs 1 through 73 above as if stated fully herein.

75. DOE's direction to do a comprehensive re-evaluation of the Industrial Hygiene / Health & Safety program increased "the time required for, performance of any part of the work under this contract" and affected "other terms and conditions of this contract. . . ." within the meaning of the Contract's Changes clause.

76. Similarly, DOE's direction to use supplied air increased "the time required for, performance of any part of the work under this contract" and affected "other terms and conditions of this contract. . . ." within the meaning of the Contract's Changes clause.

77. The Changes clause states that, in such a situation "the Contracting Officer shall make an equitable adjustment in the (1) estimated cost, delivery or completion schedule, or both; (2) amount of any fixed fee; and (3) other affected terms and shall modify the contract accordingly."

78. As a result of the above changes, CH2M HILL has been deprived of the opportunity to earn fee totaling $7,080,000.

**COUNT II**
**(Equitable Adjustment for Breach of the Government's Duty to Cooperate)**

79. CH2M HILL incorporates by reference paragraphs 1 through 73 above as if stated fully herein.

80. Every contract includes an implied duty on the part of the Government to cooperate with the contractor.

81. By failing to consider and implement CH2M HILL's BCR to mitigate the cost and schedule effects of the added requirements, DOE breached that duty.

82. As a result of the Government's breach of its duty to cooperate, CH2M HILL has been deprived of the opportunity to earn fee totaling $7,080,000.

**COUNT III**
**(Reformation)**

83. CH2M HILL incorporates by reference paragraphs 1 through 73 above as if stated fully herein.

84. Alternatively, CH2M HILL is entitled to reformation of the Contract because of the mutual mistake of fact made by the parties in entering into this Contract.

85. DOE and CH2M HILL were mutually mistaken in their belief as to a fact, specifically, whether the safe accomplishment of the work under the Contract required the use of supplied air.

86. The mistaken beliefs that the contracting parties held constituted basic assumptions underlying the Contract. Specifically, the parties agreed to a fee structure and a cost and schedule that the parties would have viewed as impossible to

accomplish had they known that the work would have to be performed under the inefficient conditions associated with the use of supplied air.

87. The mistakes had a material effect on the bargain. CH2M HILL and DOE never would have entered into a contract under which it was virtually impossible for CH2M HILL to meet the schedule and earn fee. The parties' mistaken belief was the reason that the Contract's fee structure and the specific PBIs included in the Contract were adopted.

88. Finally, the Contract did not put the risk of the mistake on the party seeking reformation, i.e., CH2M HILL. To the contrary, the Contract allows for an equitable adjustment in fee in the event of material changes in conditions. Also, DOE expected contractors to base their bids for the Contract on the information in DOE's technical library, e.g., the Hewitt Report.

WHEREFORE, CH2M HILL requests judgment on its Complaint, as follows:

A. Granting CH2M HILL an equitable adjustment in the amount of $7,080,000 or such other amount as is proven at a hearing in this matter;

B. Alternatively, reforming the Contract to add a base fee of $7,080,000 or otherwise to compensate CH2M HILL for its lost fee opportunity;

C. Awarding CH2M HILL interest pursuant to the Contract Disputes Act; and

D. Awarding CH2M HILL all other relief as is just and equitable.

Respectfully submitted,

CH2M HILL Hanford Group, Inc.

By: ______________________________

Kenneth B. Weckstein
Shlomo D. Katz
Epstein Becker & Green, P.C.
1227 25th Street, N.W., Suite 700
Washington, DC 20037
Telephone: (202) 861-1860
Facsimile: (202) 296-2882
kweckstein@ebglaw.com

Stanley J. Bensussen
Chief Counsel
CH2M HILL Hanford Group, Inc.
P.O. Box 1500, MSIN H6-18
Richland, WA 99352
Telephone: 509-372-3800
Facsimile: 509-372-1397

Attorneys for Appellant

Dated: May 16, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of May, 2007, I caused a copy of the foregoing Complaint to be served via email and U.S. mail, postage prepaid to the following:

Richard V. Gonzales, Esquire
U.S. Department of Energy
Office of River Protection
P. O. Box 450, MSIN H6-60
Richland, WA 99352.

Kenneth B. Weckstein