# In the United States Court of Federal Claims

No. 07-494 C

(Filed: May 8, 2008)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| | * | |
| **CH2M HILL HANFORD GROUP, INC.,** | * | Consolidation of Civilian Board of Contract |
| | * | Appeals and Court of Federal Claims cases; |
| Plaintiff, | * | Contract Disputes Act (41 U.S.C. § 609(d)); |
| | * | motion to expedite consideration; collateral |
| v. | * | estoppel; res judicata |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Kenneth B. Weckstein*, Brown Rudnick Berlack Israels LLP, Washington, DC, counsel of record for Plaintiff; with whom was *Shlomo D. Katz*, Brown Rudnick Berlack Israels LLP, Washington, DC; of counsel was *Stanley J. Bensussen*, Chief Counsel, CH2M Hill Hanford Group, Inc., Richland, WA.

*James W. Poirier*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for Defendant; with whom were *Jeffrey S. Bucholtz*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Donald E. Kinner*, Assistant Director, United States Department of Justice, Washington, DC.

## OPINION AND ORDER

**DAMICH**, Chief Judge.

This action arises from a cost reimbursement incentive contract ("the Contract") between Plaintiff CH2M Hill Hanford Group, Inc. ("Plaintiff"), an engineering, construction, and operations services company headquartered in Meridian, Colorado, and the United States Department of Energy ("DOE"). The Contract concerned Plaintiff's management of nuclear cleanup efforts at a decommissioned federal complex in southeastern Washington state ("the Hanford Site") where weapons grade nuclear materials were once produced. This case focuses on whether Plaintiff was entitled to $10,515,000 in incentive fees from fiscal years 2003 through 2006.

Plaintiff has also instituted a separate claim regarding the same contract before the Civilian Board of Contract Appeals ("CBCA").  Contending that the issues underlying the case pending in the CBCA ("CBCA claim") extensively overlap with those involved in the instant case, Defendant United States ("Defendant"), acting on the DOE's behalf, now moves to consolidate the two cases in this Court pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 609(d) (2006).  Defendant has also, on two occasions, moved this Court for expedited consideration of its consolidation motion, warning of the duplication of discovery efforts that having two related claims concurrently pending before two different fora risks.  The Court did not immediately rule on these motions to expedite for the reasons discussed below.

After careful review of the parties' briefing, pleadings, arguments heard at the joint preliminary status conference for this case, and all other information submitted, the Court concludes that consolidation of these two actions would indeed serve the interests of justice and the convenience of the parties and witnesses.  However, the Court also finds that the CBCA, in which this Court cannot order consolidation but to which this Court can transfer the instant case, is the proper forum for both cases.  For the reasons stated herein, then, the Court DENIES Defendant's motion to consolidate both of Plaintiff's cases in this Court and ORDERS the transfer of the instant case to the CBCA.  Defendant's motions to expedite consideration of its consolidation motion are DENIED as moot.

## I. BACKGROUND[1]

### A.  The Contract

Plaintiff entered into the Contract by assuming the obligations of a company it acquired, Lockheed Martin Hanford Corporation, in December 1999.  *See* Complaint ("Compl.") ¶¶ 13-14.  The Contract was a cost reimbursement incentive contract that included a pool for performance incentive fees.  *Id.* ¶ 17.  In a cost reimbursement incentive contract, the contractor is reimbursed for the cost of doing the work the contract specifies.  *See* 48 C.F.R. § 16.301-1 (2007).  Such contracts "establish an estimate of total cost for the purpose of obligating funds and establishing a ceiling that the contractor may not exceed (except at its own risk) without the approval of the contracting officer."  *Id.*

The specific cost reimbursement incentive contract involving Plaintiff and the DOE was a "cost plus incentive fee" contract.  *Id.* § 16.405-1; Declaration of Daniel B. Cartmell ("Cartmell Decl.") ¶ 5.[2]  In these contracts, work is either fee-bearing or non-fee-bearing.  *Id.*  For fee-bearing work, the contractor is paid a certain fee in addition to compensation for costs incurred, thereby enabling the contractor to make a profit.  *Id.*  Non-fee-bearing work, however, only allows for cost reimbursement and no other payment.  *Id.*

---

[1]The recited factual elements are undisputed unless otherwise noted.

[2]Daniel B. Cartmell is Plaintiff's chief financial officer.

Under the Contract, then, which was labeled DE-AC27-99RL14047, Plaintiff committed to managing the retrieval, treatment, and disposal of solid and liquid radioactive waste stored at the Hanford Site in 177 large (50,000 to 1,000,000 gallon) capacity underground single- and double-shell (wall) tanks, located on sites called tank farms. Compl. ¶ 9. Non-fee-bearing work under the Contract generally involved the maintenance of the tank farms in a safe and environmentally sound condition (i.e. regular maintenance, security). Fee-bearing work, in contrast, mainly consisted of achieving specified tank farm cleanup milestones known as Performance Based Incentives ("PBI"). Contract (Modification A066) §§ C.3; H.1(a), (h); J, App. D[3]; *see also* Cartmell Decl. ¶ 6.

Pursuant to the Contract, the DOE was to make available to Plaintiff a certain sum of money every year, with specific amounts allocated for funding non-fee-bearing work, fee-bearing work, and the award of fees for meeting given PBIs. Contract (Modification A096) § B.3; Compl. ¶ 21. Plaintiff contends that if the DOE did not provide enough funds to perform both non-fee-bearing work and fee-bearing work, its workers would have had to give precedence to non-fee-bearing work "because that work maintain[s] the site in a safe state." Cartmell Decl. ¶ 8. As a consequence, Plaintiff would purportedly have been unable to perform fee-bearing work and earn the fees, in addition to compensation for costs that such work entailed. *See id.* ¶ 7.

The Contract required Plaintiff to prepare and the DOE to approve a series of planning and management guidelines called an "integrated life-cycle baseline" ("baseline"), which was to reflect the technical scope of the work the Contract specified, project and program schedules, and cost profiles, as well as serve as a basis for Plaintiff's budget development, risk analysis inputs, and work prioritization. *See* Contract (Modification A066) §§ C.2(a)(2), H.1. During the course of performance, Plaintiff was to document any changes to the baseline through a baseline change request, complete with a proposed figure for a new allocation of funds for the next fiscal year if needed. *Id.* § C.2(a)(2)(viii). This request had to be authorized by a DOE contracting officer in charge of the Hanford Site project. Compl. ¶ 31; Joint Response to Order for Supplemental Information ("Supplemental Report") at 24.

Additionally, the Contract, incorporating Section 52.243-2 of the Federal Acquisition Regulations ("FAR"), specified that a contracting officer could "make changes within the general scope" of the Contract. Contract (Modification M082) § I.64 (citing FAR § 52.243-2); *see also* 48 C.F.R. § 52.243-2 (incorporating the corresponding section of the Federal Acquisition Regulations). But if such a change increased or decreased "the estimated cost of, or the time required for, performance of any part of work" under the Contract or otherwise affected the Contract's terms and conditions, Plaintiff was to receive an equitable adjustment in the 1) estimated cost, delivery, or project completion schedule; 2) amount of any fixed fee; and 3) other affected terms. 48 C.F.R. § 52.243-2. The parties were to modify the Contract accordingly. *Id.*

---

[3]Each citation to the Contract incorporates the most recent modification for the section cited.

**B.  Plaintiffs' Claims Before The CBCA And This Court**

The cases that Defendant seeks to consolidate in this Court each concern two issues: 1) "ordered and constructive changes" to the Contract the DOE made in the form of requesting additional non-fee-bearing work and 2) whether Plaintiff should receive the fees for PBIs it was allegedly unable to meet as a result.  The DOE has reimbursed Plaintiff for the costs of performing this additional work.  Therefore, Plaintiff only seeks compensation in the amount of the PBI fees it would have supposedly earned but for the DOE's actions.  Compl. ¶ 5; CBCA Compl. ¶ 4.

**1.  The CBCA Claim**

The "ordered and constructive changes" that are the subject of the CBCA claim specifically concern work on so-called "legacy vapor issues" that Plaintiff alleges was not a part of the Contract's baseline.  CBCA Compl. ¶ 1.  As stated previously, Plaintiff committed to managing the retrieval, treatment, and disposal of radioactive waste stored at the Hanford Site in 177 large underground tanks.  Compl. ¶ 9.  But "[t]he materials in the tanks have the potential to generate non-radiological vapors containing ammonia and other organic compounds."  CBCA Compl. ¶ 10.  "These vapors can escape the tanks through venting and other leak paths," thereby resulting in strong odors that could harm human health in sufficient concentrations.  *Id*.  Between 1987 and 1992, Plaintiff alleges that there were several reports of workers at the Hanford Site tank farms becoming ill due to these vapors.  *Id*. ¶ 16.  Consequently, in 1992, the contractor in charge of the Hanford Site at the time, Westinghouse Hanford Company ("Westinghouse"), required workers at specified tank farms to use supplied air for all work.  *Id*. ¶ 18.  "The term 'supplied air' refers to equipment such as self-contained breathing apparatus[es] or portable supplied air systems."  *Id*.  According to Plaintiff, supplied air use made the workers much less productive because air tanks could be heavy and awkward to wear, reduce a person's field of vision and ability to communicate, and cause a number of injuries.  *Id*. ¶¶ 64-65.  But Plaintiff also claims that a 1996 Westinghouse report concluded that the vapors posed a minimal threat.  *See id*. ¶¶ 21-29.  Thereafter, Plaintiff avers, tank farm workers limited the occasions when they used supplied air.  *See id*.

In early 2003, tank farm workers again began reporting incidents of exposure to vapors.  *Id*. ¶ 45.  Following a DOE investigation, Mr. R.J. Schepens, a DOE contracting officer, ordered Plaintiff, on March 26, 2004, to reevaluate vapor exposure protections in place and not allow tank farm workers to work without respiratory protection pending this review.  *See id*. ¶¶ 56-58.  Plaintiff alleges that this order, given without any promises for additional funding or time to meet the Contract's fee-bearing milestones, and which resulted in costs of approximately $99 million dollars, constituted a change to the Contract's terms that compelled a diversion of funds from fee-bearing activities.  *See id*. ¶¶ 61-62; Cartmell Decl. ¶ 11.  The practical effect of this order, Plaintiff argues, was to require tank farm workers to use supplied air indefinitely.  CBCA Compl. ¶ 63.  Plaintiff also states that the DOE "failed to cooperate" in its baseline change request, including an attempt to reschedule non-fee-bearing work, "that would have mitigated some of the

4

effects of the added requirements." *Id*. ¶ 70.

On October 12, 2006, Plaintiff filed a properly certified CDA claim for recovery of purportedly lost fee opportunities due to the DOE's changes and, in the alternative, for the Contract's reformation.[4] *Id*. ¶ 72.  The DOE, on February 7, 2007, denied the claim in its entirety. *Id*. ¶ 73.

Plaintiff consequently filed a three-count complaint before the CBCA on May 16, 2007. *See generally* CBCA Compl.  Count I of this complaint alleges that the DOE made ordered and constructive changes to the Contract by ordering a reevaluation of vapor exposure protection measures, depriving Plaintiff of fee-bearing opportunities. *See id*. ¶¶ 74–78.  Count II claims that by failing to consider and implement Plaintiff's baseline change request to mitigate the cost and schedule effects of reduced funding and added requirements, Defendant breached its duty to cooperate in facilitating Plaintiff's performance and opportunities to meet PBIs. *See id*. ¶¶ 79-82. Finally, Count III seeks the Contract's reformation given that Plaintiff and the DOE were, supposedly, mutually mistaken in assuming that tank farm worker safety did not require supplied air use because of the earlier Westinghouse report. *See id*. ¶¶ 83-88.  Accordingly, Plaintiff's CBCA complaint avers, the parties agreed to a certain cost and fee structure, which they otherwise would have considered unacceptable. *Id*. ¶¶ 86-87.  Plaintiff seeks an equitable adjustment or addition to the Contract of a base fee in the amount of $7,080,000, the total amount of PBI fees that the DOE purportedly precluded Plaintiff from earning due to the order for a reevaluation of vapor protection measures. *Id*., Prayer for Relief, ¶¶ A-D.  According to documentation the parties have filed with this Court, discovery in the CBCA claim is now proceeding.  Plaintiff's Opposition to Defendant's Motion to Consolidate this Action with CBCA No. 708 ("Pl.'s Opp'n"), App. at 14.

## 2. The claim before this Court

Aside from the measures described above, Plaintiff contends that the DOE, between fiscal years 2003 and 2006, ordered roughly $53 million dollars' worth of additional work not contemplated by the Contract's baseline.  Compl. ¶ 34.  The DOE allegedly did not provide additional funding for this work, which the complaint does not specify, and did not ask Congress for funding for fiscal year 2006 at the levels the Contract set forth.  *Id*. ¶¶ 34-35.  In particular, Plaintiff claims, the DOE's funding for that year fell short of its contractual commitment by approximately $69 million dollars.  *Id*. ¶ 37.  Plaintiff alternatively argues that if the DOE did receive sufficient appropriations for fiscal years 2003 through 2006, the DOE simply chose to allocate $69 million dollars less than what the Contract required for that period.  *Id*. ¶ 40.  On October 12, 2006, Plaintiff filed a properly certified CDA claim for recovery of supposedly lost fee opportunities arising from the DOE's changes and, in the alternative, for the Contract's reformation.  *Id*. ¶ 4.  The DOE denied this claim in its entirety on February 28, 2007.  *Id*. ¶ 6.

---

[4]The claim was amended and recertified on December 20, 2006.  CBCA Compl. ¶ 72.

On July 2, 2007, Plaintiff filed the complaint before this Court, now consisting of three claims for a single equitable adjustment of $10,515,000, the amount of PBI fees that the DOE allegedly precluded Plaintiff from earning in ordering the work at issue.[5]  *See id*. ¶¶ 47-66. Count I states that the DOE made ordered and constructive changes to the Contract by ordering roughly $53 million dollars' worth of additional, non-fee-bearing work the Contract did not contemplate between fiscal years 2003 and 2006, without providing sufficient funding or assigning the work fee-earning opportunities.  *See id*. ¶¶ 47-52.  Count II avers that the DOE breached its duty to cooperate in facilitating Plaintiff's performance and fee-earning opportunities by either not requesting the specified level of funding from Congress in fiscal year 2006 or, if sufficient appropriations were received between fiscal years 2003 and 2006, by simply not allocating the proper amount of funding to Plaintiff.  *Id*. ¶¶ 53-60.  Finally, Count III contends that by failing to consider and implement Plaintiff's baseline change request to mitigate the cost and schedule effects of reduced funding and added requirements, the DOE also breached its duty to cooperate in facilitating Plaintiff's performance and fee-earning opportunities.  *Id*. ¶¶ 61-66.

On October 5, 2007, in addition to answering Plaintiff's complaint, Defendant filed its motion to consolidate the CBCA claim with the case pending before this Court.  Defendant's Motion to Consolidate in this Court, a Companion Case, Currently Pending Before the Civilian Board of Contract Appeals ("Def.'s Mot.").  Plaintiff responded to this motion on October 22, 2007.  Pl.'s Opp'n.  Defendant replied to this response on November 8, 2007.  Defendant's Reply to Plaintiff's Response to Defendant's Motion to Consolidate in this Court, a Companion Case, Currently Pending Before the Civilian Board of Contract Appeals ("Def.'s Reply").

The parties filed a joint preliminary status report regarding this case on January 10, 2008.[6] Previously, on December 11, 2007, Defendant also moved this Court to expedite consideration of the motion to consolidate.  Defendant's Motion for Expedited Consideration of Defendant's Motion to Consolidate in this Court, a Companion Case, Currently Pending Before the Civilian Board of Contract Appeals.  The basis for Defendant's motion was that two concurrent proceedings on related cases in separate fora risked duplication of discovery efforts.  But

---

[5]The parties stipulated to the dismissal of a fourth claim for reformation of the Contract on November 6, 2007.  Stipulation of Dismissal of Count IV (Nov. 6, 2007); *see also* Compl.¶¶ 67-72.

[6]The parties were originally supposed to file the joint preliminary status report on November 26, 2008, but did not do so until January 10, 2008, because of a series of unopposed motions for enlargements of time filed by Defendant that this Court granted.  *See* Order Granting Motion for Extension of Time to File the Joint Preliminary Status Report (Dec. 5, 2007); Order Granting Motion for Extension of Time to File the Joint Preliminary Status Report (Dec. 10, 2007); Order Granting Motion for Extension of Time to File the Joint Preliminary Status Report (Dec. 20, 2007); Order Granting Motion for Extension of Time to File the Joint Preliminary Status Report (Jan. 7, 2008); Joint Preliminary Status Report (Jan. 10, 2008).

Defendant did not specify a date by which it felt the consolidation motion had to be decided or why the Court and parties could not wait until the upcoming joint preliminary status conference, which was to be scheduled as soon as possible after submission of the joint preliminary status report, to further discuss the matter. *See id.* The Court consequently elected not to immediately act on the consolidation motion, but did not issue a ruling to that effect given the communications with the parties that would soon take place.

At the joint preliminary status conference, held on February 5, 2008, the Court extensively questioned both parties about their respective positions as to consolidating the two cases. *See* Joint Preliminary Status Conference Transcript ("JPSC Tr.") 45:13 (characterizing the conference as a "mini[-]oral argument" on the motion). Defendant also suggested no imminent date by which irreparable prejudice would result if the consolidation motion was not resolved and did not renew its request for expedited consideration, though Defendant did describe a situation of some urgency given the progress of discovery before the CBCA and how it hoped to use some of the same experts in both cases. *See id.* 46:11-49:14.

On February 21, 2008, the Court issued an order requesting that both parties answer specified questions regarding a number of factual issues pertinent to the consolidation motion. Order (Feb. 21, 2008). The parties consequently submitted a Joint Response to the Order for Supplemental Information on March 4, 2008. *See* Supplemental Report.

Plaintiff also filed a second motion to expedite consideration of its consolidation motion on April 29, 2008. Defendant's Renewed Motion for Expedited Consideration in this Court, a Companion Case, Currently Pending Before the Civilian Board of Contract Appeals.[7] At this time, Plaintiff has not responded. The Court's decision today simply moots this issue.

## II.  STANDARD OF REVIEW

The CDA provides that "[i]f two or more suits arising from one contract are filed in the United States Court of Federal Claims and one or more agency boards [of contract appeals], for the convenience of parties or witnesses or in the interest of justice, the United States Court of Federal Claims may order the consolidation of such suits in that court or transfer any suits to or among the agency boards [of contract appeals] involved."[8]  41 U.S.C. § 609(d).  This Court

---

[7]Defendant's motion is actually entitled "Defendant's Motion for Expedited Consideration of Defendant's Motion to Consolidate in this Court, a Companion Case, Currently Pending Before the Civilian Board of Contract Appeals," the same as its first motion to expedite. This Court, however, refers to it as a renewed motion to ensure accuracy.

[8]An "agency board" means an agency board of contract appeals established under the CDA to hear contract claims against specified government agencies. *See* 41 U.S.C. §§ 601(6), 607(a)(1). The CBCA, established in 2007, is one such board with jurisdiction over the DOE. *See id.* §§ 438, 607.

"possesses broad discretion in exercising its power to consolidate" or transfer a case to an agency board. *Joseph Morton Co. v. United States*, 757 F.2d 1273, 1280 (Fed. Cir. 1985). Congress's intent in enacting the CDA was to limit the "splitting of . . . causes of action . . . under one contract." S. Rep. No. 95-1118, at 31 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5265. "For example, a $40,000 suit cannot and should not be able to be split into four $10,000 suits that could be handled through [an] expedited small claims procedure." *Id*.

Nonetheless, while the CDA's statutory language states that consolidation or transfer are appropriate when the "interest of justice" or "convenience of parties or witnesses" dictate, the Court must also be "sensitive to the reasons why the suits have been split, and should not consolidate only for the sake of consolidation." *Id*. If a contractor files a "large and complex" action before the Court of Federal Claims and a "smaller claim under the same contract, and possibly the same suit, arises," the contractor should be able to expedite the smaller claim's resolution through an agency board. *Id*. In general, a court "should weigh the positions of the parties involved." *Id*.

Other decisions of the Court of Federal Claims and its predecessors have articulated criteria for determining whether to transfer and consolidate claims submitted to an agency board with claims before the court or transfer a case pending before the court to a board. A 1990 decision by the Court of Federal Claims in *Giuliani Contracting Company v. United States* summarized these factors:

1.    Whether the disputes before the board and the court concern the same contract.

2.    Whether the claims before the court and board duplicate claims or involve overlapping or related issues.

3.    Whether Plaintiff initially chose to file its claims before the court or a board.

4.    Whether one forum or the other has made significant progress on the claim.

5.    Whether concurrent resolution would result in an inefficient allocation of Court, board, and party resources.

6.    Whether separate fora could reach inconsistent results when interpreting the same contract.

*Giuliani Contracting Co. v. United States*, 21 Cl. Ct. 81, 83 (1990); *see also Am. Renovation and Const. Co. v. United States*, 77 Fed. Cl. 97, 102-05 (2007); *Rockwell Automation, Inc. v. United States*, 70 Fed. Cl. 114, 126-28 (2006); *Northrop Grumman Corp. v. United States*, 70 Fed. Cl. 230, 231-35 (2006). The United States Court of Appeals for the Federal Circuit has not explicitly commented on this framework, but has upheld Court of Federal Claims decisions that have relied on it. *See In re Morse Diesel Int'l.*, 163 Fed. Appx. 878, 879 (Fed. Cir. 2006)

(unpublished).

## III.  ANALYSIS

Pursuant to the *Giuliani* criteria and the CDA, the Court finds that Plaintiff's motion to consolidate its claims in this Court should be denied and that Plaintiff's claim before this Court should be transferred to the CBCA.

### A.  Plaintiff's Claims Stem From The Same Contract And Implicate Overlapping Issues

There is no dispute that the cases before the CBCA and this Court arise from the same contract.  *See, e.g.*, Notice of Filing Contract Amendments (Feb. 8, 2008) (stating that both claims involve one version of the same contract–the version in place between October 1, 2002 and September 30, 2006, along with all modifications that occurred within that time).  Instead, Plaintiff's motion for consolidation primarily concerns the extent to which the cases before the two tribunals overlap.

The parties' briefing generally focuses on whether both claims seek unearned fees for the same PBIs, as well as the degree to which the claims stem from the same assumptions and issues. In regard to the question of unearned fees, the CBCA claim, aside from solely concerning vapor protection measures as opposed to other supposedly non-fee-bearing work, raises some compensation questions that are not pending before this Court.  Defendant argues that both suits seek fees for specific milestones within the same general incentive category, which involved the retrieval of waste from high risk single shell tanks (i.e. PBI 3).[9]  *See* Def.'s Mot. at 4-7, App. at 24-29.  But Defendant concedes that Plaintiff's compensation claim in the case before this Court also includes milestones within a different incentive category for other waste retrieval.  *See id.* at 5, 6-7.  Defendant also does not dispute Plaintiff's characterization of its compensation claims–how the CBCA claim involves work on milestones that had not begun and, therefore, a hypothesis of milestones that could have been met, while the claim before this Court involves work on specific incentives that had already commenced.  *See id.* at 6-7; *see also* Pl.'s Opp'n at 6-7; Cartmell Decl. ¶ 30; Supplemental Report at 17-18.

Because two of the three counts in each complaint–the respective claims for an equitable adjustment for ordered and constructive changes and for the DOE's breach of its duty to cooperate–stem from the same clause in the Contract, the Court finds that there is extensive overlap between the two actions.  Though the claims may differ in specific factual details (e.g. the CBCA claim's specific focus on protections from vapors versus the unspecified work at issue in the claim before this Court), the overall proof regarding these counts will require almost

---

[9]Defendant also argued that both claims sought unspecified amounts in missed acceleration fees, or fees for performing approved extra work funded by cost savings in work within the Contract's scope.  Def.'s Mot. at 7.  Plaintiff, however, later clarified that it was not seeking such compensation.  JPSC Tr. 4:18 – 8:23.

identical legal analyses and presentations of similar evidence. *See Giuliani*, 21 Cl. Ct. at 83 (maintaining that two cases were similar in that "[w]hile details of issues before this court and [an agency board] differ[ed] . . . proofs inevitably will overlap" and "[b]oth suits require[d] presentations of similar evidence on the same contract.").

### 1. Both claims seek an equitable adjustment for ordered and constructive changes to the Contract

The first counts of both complaints seek an equitable adjustment for the DOE's order of additional work that Plaintiff's baseline did not contemplate, solely differing on what this work involved. In the claim before this court, Plaintiff alleges that the DOE ordered approximately $53 million dollars' worth of non-fee-bearing work between fiscal years 2003 and 2006, though the complaint does not specify what the work actually entailed. Compl. ¶¶ 34, 48. Plaintiff states that the DOE's failure to provide funds for performing this additional work led to the diversion of other funds meant for fee-bearing work, thereby causing Plaintiff to lose the opportunity to earn $10,515,000 in PBI fees. *Id.* ¶¶ 49, 51. The CBCA claim contends that the DOE's order to reevaluate vapor protection measures in place and the resulting use of supplied air amounted to $99 million dollars' worth of work that the Contract's baseline did not anticipate, making Plaintiff lose $7,080,000 in potential incentive fees. CBCA Compl. ¶¶ 58–66, 76, 78; Cartmell Decl. ¶ 11.

Plaintiff claims that these counts of each complaint concern different provisions of the Contract. According to Plaintiff, the primary clauses pertinent to the CBCA claim are Sections C.1, C.2, and C.3 of the Contract, which define the sort of work that is within the scope of the Contract and, therefore, raise the issue of whether the Contract required Plaintiff to take measures to protect workers from vapors or whether the DOE's order was a change to the Contract. Pl.'s Opp'n at 11; Cartmell Decl. ¶¶ 18-19. Plaintiff further contends that the primary Contract clause relevant to the claim before this Court is Section B.3, which specifies the appropriations expected from the DOE each year, making the complaint depend on whether the DOE violated a duty to provide a certain amount of funding. *Id.* at 13-14. The actual clause on which both complaints explicitly rely, however, belies these arguments.

Both counts refer to the Contract's incorporation of FAR § 52.243-2, which mandates equitable adjustments for costs or additional time stemming from work beyond the Contract's scope, and not Sections B.3, C.1, C.2, or C.3. Compl. ¶ 50; CBCA Compl. ¶ 77; Contract (Modification A066) § I.64 (citing FAR 52.243-2); *see also* 48 C.F.R. § 52.243-2. The specific work at issue in both instances may be different, but the analysis for determining the DOE's liability is the same–whether the work in question was beyond the Contract's scope and required an equitable adjustment as a result. In essence, the same standard of review applies to both claims. And since the same contract, project, and parties are involved, proofs will be the same to an extensive degree.

For example, the CDA allows consolidation for the convenience of witnesses. 41 U.S.C.

§ 609(d). Plaintiff has admitted that the same contracting officer who ordered the work at issue in the CBCA claim, Mr. Schepens, was also involved in "directing" the work at issue in the claim before this Court. Supplemental Report at 21. While the parties have not specified whether Mr. Schepens will be called to testify, Defendant has noted that evidence regarding his actions may be relevant to whether the DOE abused its discretion and failed to use its "best efforts" to reduce "non-value-added requirements" in regard to both claims. *Id.* at 23-24 (citation omitted). This kind of overlapping proof demonstrates why one forum should decide both suits.

### 2. Both claims seek an equitable adjustment for the DOE's alleged breach of a duty to cooperate

Count II of the claim before this Court and Count III of the CBCA claim are identical from a legal standpoint. Both argue that by failing to consider and implement Plaintiff's baseline change requests to mitigate the cost and schedule effects of added work requirements, the DOE breached a duty to cooperate with Plaintiff and precluded opportunities to earn PBI fees. Compl. ¶¶ 42-43, 62-65; CBCA Compl. ¶¶ 70-71, 80-81. As in the claims' first counts, the immediate facts surrounding the work requirements and baseline change requests may differ. But, as Plaintiff conceded during the joint preliminary status conference, the pertinent legal analysis– whether the DOE's rejections of Plaintiff's baseline change requests amounted to breaches of a duty to cooperate with Plaintiff in facilitating performance–is also the same. *See* JPSC Tr. 26:15-24. Moreover, in another example of potentially overlapping proof, Plaintiff also notes that the same contracting officer signed both of the certified CDA claim decisions that the parties now contest before the CBCA and this Court and will be a witness in both cases. Pl's. Opp'n at 16, n.8. Presumably, she will be able to testify on issues common to both cases such as when an equitable adjustment would be justified.[10] These factors, then, also favor consolidation.

### 3. The planned causation defense and the claims' other counts

The two claims' remaining counts allege different causes of action. Count II of the claim

---

[10]Plaintiff claims that "there is little added efficiency to be gained from deposing [the contracting officer] once for two days versus twice on one day since the deposition(s) would likely take place near her office." Pl.'s Opp'n at 16, n.8. However, the similarities of both claims imply that this may be one of many instances where the same witnesses may be called to testify. *See, e.g.*, Supplemental Report at 21 (where Defendant indicates that contracting officer R.J. Schepens directed the work involved in both claims). This statement does not explain why the Court should err on the side of duplicative testimony given the CDA's apparent intent to limit such occasions to claims that differ in magnitude. *See* S. Rep. No. 95-1118, at 31 (giving the example of a "large and complex" claim before the Court of Claims, this Court's predecessor, as opposed to a smaller claim arising from the same contract or suit, the resolution of which a contractor may pursue through more expedited agency board actions); *see also* RCFC 42(a) (provision for consolidating actions involving "common questions of law or fact" illustrates how a concern for judicial economy is not unique to actions involving the CDA).

before this Court seeks an equitable adjustment based on the DOE's alleged failure to request funding between fiscal years 2003 and 2006 at the levels the Contract set forth or, alternatively, the DOE's failure to allocate to Plaintiff the proper level of funding from its annual congressional appropriation in fiscal year 2006. Compl. ¶¶ 36-40, 56-58. This breach of the duty to cooperate by providing the requisite funding purportedly deprived Plaintiff of fee-earning opportunities. *Id*. ¶¶ 39, 41, 55-59. In contrast, Count III of the CBCA claim avers that the parties were mutually mistaken in regard to whether "the safe accomplishment of the work under the Contract required the use of supplied air" and that this mistake led them to agree to a "fee structure and a cost and schedule that the parties would have viewed as impossible to accomplish had they known" that supplied air use would be necessary. CBCA Compl. ¶¶ 85-86. This mistake, Plaintiff continues, was the reason why the Contract's fee structure and specific PBIs were adopted and why Plaintiff could not earn fees. *Id*. ¶ 87.

On their own, these causes of action–one seeking reformation and one alleging a breach of a duty to cooperate–are "analytically distinct." *Precision Pine & Timber, Inc. v. United States*, 45 Fed. Cl. 134, 136 (1999). But since the Court should "weigh the positions of both parties involved," Defendant's plan to assert that a lack of funding did not cause the harm Plaintiff alleges in both cases is relevant here. S. Rep. No. 95-1118, at 31.

Defendant contends that the basic premise underlying both complaints is identical–that if the DOE had provided more funding, Plaintiff would have been able to satisfy more PBIs and earn the corresponding fees. *See* Def.'s Mot. at 8; Def.'s Reply at 7-11; JPSC Tr. 12:7-13:10, 13:19-16:14, 22:2-24:23, 32:10-22, 34:5-36:18. If the Court makes such an analysis for either case, Defendant asserts, "the analysis must consider [the DOE's] defense that [Plaintiff's] overall performance demonstrates that [Plaintiff's] own poor management was the reason [Plaintiff] failed to earn more fee[s]." Def.'s Reply at 8; *see also* JPSC Tr. 12:20-25, 14:6-16:13, 23:21-24:23, 32:10-22, 34:5-36:18.

Plaintiff does not address this argument in its briefs aside from its focus on the claims' factual distinctions. *See generally* Pl.'s Opp'n at 2-3, 6-7, 13-14. In fact, the main point on which Plaintiff distinguishes the claims is how the claim before this Court purportedly focuses on the DOE's breach of its duty to provide adequate funding, while the CBCA claim stems from allegedly unauthorized changes the DOE made to the Contract. *See id.* at 10-14. Plaintiff, then, does not really address Defendant's argument about why the actions are different.

At the joint preliminary status conference, Plaintiff stressed its view that Defendant's proposed defense could not apply to the issue of liability in both claims, but conceded that the defense might be relevant in regard to the questions of damages that both claims will entail. JPSC Tr. 33:2-34:2. The matter of adequate DOE funding and its relationship to Plaintiff's inability to earn specified PBI fees is present in both claims, though it is emphasized to varying degrees. The claim before this Court explicitly identifies the Contract clauses that specified the requisite amounts of funding. Compl. ¶¶ 21-22. In addressing the changes the DOE ordered, Plaintiff describes how the funding actually received was inadequate and provides specific

12

figures to this effect.  *See id.* ¶¶ 34-40.  Each count of the claim before this Court alleges inadequate funding to some degree or implicates this issue in stating the reason for the pertinent baseline change request.  *See id.* ¶¶ 48-49, 64.  The second count also alleges a breach of the duty to cooperate due to a supposed failure to either request sufficient congressional appropriations or allocate an appropriate level of funding from the appropriations received.  *See id.* ¶¶ 56-58, 64.

In contrast, the CBCA claim mentions how the DOE did not provide appropriate funding or how the baseline change request involved implicated this problem in fewer instances.  *See* CBCA Compl. ¶¶ 62-63, 70.  But a lesser focus is not the same as a complete absence.  Just the fact that the issue is present, as Plaintiff itself acknowledges in its complaint, means that Defendant's planned defense as to how Plaintiff is more at fault for the damages incurred is also applicable in this instance.  Only the third count in the CBCA claim, seeking the Contract's reformation, does not explicitly mention the funding issue.  The DOE's funding of Plaintiff's efforts, however, is relevant here as well.

Again, Plaintiff states that the parties "mistaken beliefs constituted a basic assumption underlying the Contract" and that they "agreed to a fee structure and a cost and schedule that the parties would have viewed as impossible to accomplish had they known that the work would have to be performed under the inefficient conditions associated with the use of supplied air."  *Id.* ¶ 86.  Plaintiff continues that these "mistakes had a material effect on the bargain" and that the parties "never would have entered into a contract under which it was virtually impossible for [Plaintiff] to meet the schedule and earn fee[s]."  *Id.* ¶ 87.  These statements assume that the funding the Contract specified was inadequate for the changes requested, though they do not explicitly say so.  By averring that it would not have agreed to the eventual fee and cost schedule had it known that supplied air would be used in the future, Plaintiff implies that it would have requested greater funding requirements in negotiating the Contract, especially given their contention in previous counts that funding was inadequate.  Consequently, a rebuttal argument that the funding provided was adequate or that it did not preclude Plaintiff from earning the specified fees, as opposed to Plaintiff's own inefficient work practices, certainly applies to the reformation count.

The Court finds that Defendant's approach as to the matter of "causation and damages would put at issue the entire performance of [Plaintiff] (to determine the degree to which mismanagement caused Plaintiff to miss incentive fee goals)."  Def.'s Reply at 11-12.  Defendant's conclusion that "*the same documents and the same witnesses* (located [near where the CBCA will hear the case,] Richland, Washington,) would be central to the proof of causation and damages *in both cases*," then, is eminently reasonable in regard to not only the reformation count, but all counts of both complaints.  *Id.* (alteration in original).  To avoid duplication, then, one tribunal should consider each case.

**B.  Plaintiff's Choice Of Separate Fora Weighs In Favor Of Transfer**

*Giuliani* lists two associated factors regarding how a plaintiff's choice of forum affects a

consolidation motion–whether a plaintiff initially chose to file a claim before the Court of Federal Claims or a board and whether one forum has made significant progress toward a claim's resolution as opposed to the other forum. *Giuliani*, 21 Cl. Ct. at 83. "Plaintiff's first choice of forum is relevant to deciding which forum will hear [a] case, assuming that consolidation is appropriate." *Precision Pine*, 45 Fed. Cl. at 137. Furthermore, if substantial efforts have been expended in one forum, but not the other, "[i]t would be unfair to [a plaintiff] to deny it quick resolution on its appeal [of a contracting officer's denial of a claim] by entangling it" with a suit before a tribunal that has not proceeded as quickly. *Id.*

Defendant argues that Plaintiff's decision to initially file a claim before the CBCA "is entitled to little weight" and that "[t]his Court has entertained more focused analysis of the nature of the claims than has been presented to the board." Def.'s Reply at 14-15. These cases' extensive overlap, the fact that discovery in the CBCA claim is in its advanced stages, and the scheduling of a hearing regarding the CBCA claim for this October, however, do not support this contention. *See* Pl.'s Opp'n, App. at 14-16. Discovery in the claim before this Court has not formally begun.[11]  Moreover, Defendant has suggested that the earliest possible date on which trial of the claim before this Court could commence is January 10, 2010. Joint Preliminary Status Report at 10. The "much steeper learning curve" this Court would have to climb in consolidating both claims in this Court thus weighs in favor of transferring the claim before this Court to the CBCA. *Giuliani*, 21 Cl. Ct. at 84.

## C.  Separate Proceedings Would Result In Inefficiency And Inconsistent Results

As previously explained, these two cases will likely involve identical legal analyses and related presentations of factual evidence. *See infra* at 8-13. Duplicating such efforts needlessly damages the interests of encouraging judicial economy wherever possible.

The Court must also consider the risk that rulings in one forum would bind the second forum through the doctrines of collateral estoppel or res judicata. Collateral estoppel holds that once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 336 n.16 (2005) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). Res judicata establishes that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Id.* Case law holds that these doctrines apply to boards of contract appeals and the courts. *See Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991) ("We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative

---

[11]The Court, at the joint preliminary status conference, encouraged the parties to pursue discovery voluntarily to the extent they could agree on terms to govern the process while the consolidation motion was under consideration. JPSC Tr. 46:2-57:24. However, discovery in the CBCA claim had been in progress since July 19, 2007 at the latest. Pl.'s Opp'n., App. at 14.

bodies that have attained finality."); *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966) ("When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose."); *Pound v. United States*, 63 Fed. Appx. 499, 501 (Fed. Cir. 2003) (unpublished) (upheld a Court of Federal Claims ruling giving res judicata effect to an Army Corps of Engineers Board of Contract Appeals decision terminating a plaintiff's lease).

This Court has already expressed concern that the CBCA, having advanced further in its proceedings, could collaterally estop this Court in regard to an issue common to both cases. JPSC Tr. 40:3-18.  Collateral estoppel of the Court of Federal Claims because of proceedings at a contract appeals board is not unprecedented.  *See Ingalls Shipbuilding, Inc. v. United States*, 21 Cl. Ct. 117, 123 (1990) (collateral estoppel prevented the government from relitigating a fraud case against a contractor because the issue of the contractor's fraud had already been adjudicated by the Armed Services Board of Contract Appeals).  In this instance, both parties have acknowledged that collateral estoppel could apply to such issues, likely common to both cases, as the baseline's legal significance or how a "change from the initial planning document" created a contract right of some sort.  JPSC Tr. 40:3-45:10.

## IV.  CONCLUSION

Pursuant to the foregoing criteria, the interests of justice and convenience of the parties and witnesses strongly weigh in favor of consolidating both claims before the same tribunal. This Court also finds that the CBCA is the proper forum for Plaintiff's actions.  But the Court can only transfer claims to the CBCA and lacks the authority to order consolidation before that body.  Transfer of the claim before this Court to the CBCA, then, is hereby ORDERED, along with a recommendation that the parties seek consolidation before that forum if possible.  The Court consequently DENIES Plaintiff's motion for consolidation.  Defendant's motions to expedite consideration of this motion are DENIED as moot.

s/Edward J. Damich
EDWARD J. DAMICH
Chief Judge